**ARNOLD TOURS, INC., et al.,**
**Plaintiffs-Appellees,**

v.

**William B. CAMP, Comptroller of the**
**Currency of the United States,**
**Defendant-Appellant,**

**South Shore National Bank, Defendant-**
**Appellant.**

**Nos. 72–1142, 72–1143.**

United States Court of Appeals,
First Circuit.

Heard Sept. 7, 1972.

Decided Dec. 13, 1972.

Elliott V. Grabill, Boston, Mass., with whom Arthur H. Bloomberg and Grabill

& Ley, Inc., Boston, Mass., were on brief, for South Shore National Bank.

Leonard Schaitman, Atty., Dept. of Justice, with whom Harlington Wood, Jr., Acting Asst. Atty. Gen., Herbert F. Travers, Jr., U. S. Atty., Alan S. Rosenthal, Atty., Dept. of Justice, and John E. Shockey, Atty., Office of the Comptroller of the Currency, were on brief, for William B. Camp.

Richard W. Murphy, Boston, Mass., with whom Murphy, Lamere & Murphy, Timothy J. Murphy, Boston, Mass., Wilkinson, Cragun & Barker, Paul S. Quinn, and Pierre J. Laforce, Washington, D. C., were on brief, for appellees, Arnold Tours, Inc., and others.

Before COFFIN, Chief Judge, McENTEE and HAMLEY,* Circuit Judges.

HAMLEY, Circuit Judge.

This class action involves the authority of national banks to engage in the travel agency business. The plaintiffs are Arnold Tours, Inc., and forty-one other independent travel agents of Massachusetts engaged in the travel agency business.

One of the defendants is William B. Camp, Comptroller of the Currency (Comptroller), whose office has issued rulings and regulations to the effect that national banks may engage in that business. The other defendant is South Shore National Bank (South Shore), a national banking association chartered by the United States Government, with a principal place of business in Quincy, Massachusetts, and with twenty-seven branch offices throughout Massachusetts. South Shore has been engaged in the travel agency business, operating it as a department of the bank, since November, 1966, after having bought out

the fourth largest travel bureau in New England. Plaintiffs asked for declaratory and injunctive relief, the effect of which would be to force South Shore out of the travel business.[1]

The parties filed cross-motions for summary judgment. The district court granted judgment for plaintiffs. The court judicially declared that it is illegal for a national bank to operate a full-scale travel agency. The court also judicially declared that the Comptroller's regulation set out in 12 C.F.R. § 7.1 (1959), now superseded by 12 C.F.R. § 7.7475 (1972), is invalid to the extent that it is construed by the Comptroller as authorizing a national bank to operate a full-scale travel agency. In addition, the court permanently enjoined South Shore from engaging in the travel agency business and ordered the bank to divest itself of its travel department within six months. Arnold Tours, Inc. v. Camp, 338 F.Supp. 721 (D.Mass. 1972).

The Comptroller and South Shore took separate appeals which we consolidated for purposes of argument and disposition. The district court has stayed its judgment pending disposition of the appeals. For the reasons stated below we affirm, but with one qualification.

The parties are in agreement that if there is any statutory authority for national banks to engage in the travel agency business, it is to be found in the following language contained in 12 U.S.C. § 24, Seventh, a provision of the National Bank Act (Act):

"Seventh. To exercise . . . all such incidental powers as shall be necessary to carry on the business of banking. . . ."

The Comptroller relied upon the quoted statutory words in his 1963 ruling

* Of the Ninth Circuit, sitting by designation.

1. Protracted proceedings were had on the question of plaintiffs' standing to sue, and this question was finally resolved in favor of plaintiffs. See Arnold Tours, Inc. v. Camp, 286 F.Supp. 770 (D.Mass.1968), affirmed 408 F.2d 1147 (1st Cir. 1969), vacated and remanded 397 U.S. 315, 90 S.Ct. 1109, 25 L.Ed.2d 333 (1970); Arnold Tours, Inc. v. Camp, 428 F.2d 359 (1st Cir. 1970), reversed and remanded, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970).

that national banks could engage in the travel agency business. Thus, paragraph 7475 of the Comptroller's Manual for National Banks (1963), which is now codified as 12 C.F.R. § 7.7475, reads:

"§ 7.7475 National banks acting as travel agents

"Incident to those powers vested in them under 12 U.S.C. 24, national banks may provide travel services for their customers and receive compensation therefor. Such services may include the sale of trip insurance and the rental of automobiles as agent for a local rental service. In connection therewith, national banks may adver-

tise, develop, and extend such travel services for the purpose of attracting customers to the bank." [2]

In holding that 12 U.S.C. § 24, Seventh, did not authorize national banks to engage in the travel agency business the district court, in its opinion, first focused attention on the nature of South Shore's travel agency operation. The court relied upon the graphic description of a modern agency operation given by Charles F. Heartfield.[3] Heartfield had served as vice-president of South Shore, in charge of its travel department, from November 1, 1966 to 1970. His description of a modern agency operation is set out in the margin.[4]

2. Paragraph 7376 of the Comptroller's Manual for National Banks (1963), codified as 12 C.F.R. § 7.7376, provides in pertinent part:

"§ 7.7376 *Operating subsidiaries.*

"(a) *General rule.* With the prior approval of the Comptroller of the Currency, a national bank may engage in activities, which are a part of the business of banking or incidental thereto, by means of an operating subsidiary corporation. . . .

"(b) *Activities permitted.* An operating subsidiary may perform any business function which the parent bank is permitted to perform. For example, through a bank department or an operating subsidiary, a national bank may issue credit cards, service mortgages, lease property, offer travel services, or operate a credit bureau."

3. The district court stated that this description is set out in an affidavit by Heartfield, filed in the case. However, it is actually contained in the transcript of a speech Heartfield had given on November 14, 1966, which transcript was attached, as an exhibit, to the Heartfield affidavit.

4. Heartfield said:

"A travel department is a functioning complete travel service bureau within the confines and control of the bank. It is a department store of travel—staffed by knowledgeable people—trained in the techniques of selling every mode of transportation—air, rail, steamship, U-drive car. It is a staff acquainted with thousands of hotels and resorts—proficient in the intricacies of foreign customs and regulations, health requirements and languages, accustomed with tipping customs, foreign

exchange, conversant with foreign representatives and hotel managers, tour operators and tour guides, knowledgeable in the history and geography of our own great United States—as well as the rest of the shrinking world, constantly aware of changing tarrifs [sic] and schedules, well acquainted with over 60 airlines throughout the world, 40 domestic and international railroads, and numerous motorcoach lines, steamship companies, etc. They must be up-to-date in passport, visa and sailing permit information—"They must be specially trained and experienced in the preparation and planning of itineraries—"They must be ready to acquaint the traveler with climate conditions, wardrobe and packing suggestions—"They must have unlimited knowledge of foreign car purchases, U-drive-it regulations and costs—"They must be ready with shopping suggestions, and must be able to advise on travel accident and baggage insurance—"They must be able to arrange transfers and sightseeing, and must be aware of the proper assessments, head taxes, port taxes, and transporation taxes—"They must be knowledgeable in what to see and what to do—theatre tickets, ballet, opera, horse shows, yachting events—and —at their fingertips, a good travel staff has hundreds of tours, ranging from a week-end in New York to an African safari. A good travel agent's experience and interest lends the proper emphasis to his client's desires. He can put himself in the place of his customer. He must discover the traveler's budget and give him the most for his money—and here the bank's pay-later plan will be invaluable. The well-trained agent is able to decide whether his client should go by air or sea, or a combination of both,—which

The district court then observed that

"To say that conduct of a business of the nature and type described by Mr. Heartfield is a *sine qua non* to the successful operation of a national bank is a self-refuting proposition, especially in view of the fact that on the defendants' own claim only 122 national banks out of the many hundreds if not thousands in existence were providing travel agency services in 1967."[5]  338 F.Supp. at 723.

The Comptroller argues that the district court applied an erroneous legal standard in reviewing the Comptroller's construction of the "incidental powers" clause of the National Bank Act (12 U. S.C. § 24, Seventh), as indicated by the court's above-quoted use of the term *sine qua non*.

■■■  We are in agreement with the Comptroller that a *sine qua non* standard would be an inappropriate measure of a national bank's incidental powers under 12 U.S.C. § 24, Seventh. While the pertinent language of that section refers to all such incidental powers "as shall be necessary to carry on the business of banking," we do not believe "necessary" was there used to connote that which is indispensable.

But we believe that, read in context with its entire opinion, the district court's reference to the concept of *sine*

*qua non* was not intended to state the test for determining whether a particular bank activity is authorized as an incidental power. What seems to us to be a more reliable gauge of the district court's rationale is its discussion immediately following the *sine qua non* statement quoted in the margin.[6]

The district court therein indicated that its chief concern was whether a travel agency business primarily involves the performance of financial transactions pertaining to money or substitutes therefor. If not, the court in effect ruled, that business was not within the normal and traditional range of the monetary activities of a national bank, and thus not encompassed by the "incidental powers" provision of 12 U. S.C. § 24, Seventh. It was on this basis that the district court distinguished the travel agency business from such approved "incidental powers" of national banks as those employed in selling travelers' checks or foreign currency, issuing letters of credit, or making travel loans.

But the Comptroller and South Shore do not agree that the "incidental powers" of national banks should even be restricted to the performance of financial transactions pertaining to money or substitutes therefor or that only such transactions lie within the normal traditional range of the activities of a national bank.  The Comptroller and South

---

cruise will please his client the most—which hotel will satisfy his client's taste—whether a motor-coach or a chauffeur-driven sightseeing trip will be the answer to his client's wishes.  There are escorted and independent tours—each has its own advantages.  There are basic trips, charters, all-expense trips, and special flights.  The agent's knowledge must encompass information on bike rentals in Bermuda to villa rentals on the Riviera to a houseboat in Kashmir.

"To sum it up—a good travel department is a personalized department store of travel."

5.  At the end of 1965 there were 4,815 national banks; at the end of 1971 there were 4,587.

6.  Immediately after its *sine qua non* references, the district court said:

"I find that defendants' argument that because the bank may engage in selling letters of credit, travelers' checks and foreign currency, or make travel loans, it therefore should also be allowed to engage in the travel business, is a complete *non sequitur*.  Selling travelers' checks or foreign currency, issuing letters of credit or making loans, are all financial transactions as they involve money or substitutes therefor, and all are obviously within the normal traditional range of monetary activities of a national bank.  The difference between these activities and conducting a travel agency is just as great as the difference between these activities and running a mill, which was proscribed many many years ago in Cockrill v. Abeles, 86 F.2d 505 (8 Cir. 1898)."  338 F.Supp. at 723.

Shore, for example, refer to McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), which upheld the constitutionality of the first Bank of the United States, as laying down the broad principle that the word "necessary" may include that which is convenient, or useful.

McCulloch v. Maryland was concerned not with statutory construction but with the power of Congress, under Article I, § 8 of the Constitution, "to make all Laws which shall be necessary and proper." With reference to the Constitution, it is an established principle that implied powers are to be generously construed. This is what Chief Justice Marshall meant in *McCulloch* when he said: "[W]e must never forget that it is a *constitution* we are expounding." 17 U. S. at 407. Almost the identical argument defendants here make concerning McCulloch v. Maryland was made in Texas & P. Ry. Co. v. Pottorff, 291 U.S. 245, 247, 249, 253, 259, 54 S.Ct. 416, 78 L.Ed. 777 (1934), and it was rejected or ignored by the Supreme Court.

The Comptroller and South Shore refer to the fact that the New York free banking law, enacted in 1838, contained an "incidental powers" provision almost identical with that contained in the National Bank Act, enacted in 1863; that, in 1857, a New York Court of Appeals in Curtis v. Leavitt, 15 N.Y. 9 (1857), gave the quoted words of the New York Act an expansive reading; and that those who sponsored the National Bank Act in Congress made it clear that the federal legislation was copied, almost word for word, from the earlier New York Act.

The essence of the New York decision in *Curtis* is distilled in these words in the opinion of the court:

"But necessity is a word of flexible meaning. There may be an absolute necessity, and a small necessity; and between these degrees there may be others depending on the ever varying exigencies of human affairs. It is

plain that corporations, in executing their express powers, are not confined to means of such indispensable necessity that without them there could be no execution at all. . . ." 15 N.Y. at 64.

We are in accord with these views and we are willing to assume that Congress entertained these views when it enacted the National Bank Act. But we do not find these views particularly helpful in determining whether the district court erred in holding that a national bank's incidental powers under 12 U.S.C. § 24, Seventh, are limited to the performance of financial transactions pertaining to money or substitutes therefor, and that the travel agency business falls outside the scope of such powers because it is not within the normal traditional range of the monetary activities of a national bank. It may be convenient and useful for a national bank to carry on any number of activities. But one of the critical questions here is whether a convenient and useful activity be within the incidental powers of a bank if it is not directly related to what 12 U.S.C. § 24, Seventh, refers to as "the business of banking."

The most reliable guides as to what is encompassed in the term "the business of banking" are the express powers of national banks as set out in the National Bank Act. And when one looks at past decisions it becomes apparent that the activities of national banks which have been held to be permissible under the "incidental powers" provision have been those which are directly related to one or another of a national bank's express powers.

Thus, in Merchants' Bank v. State Bank, 77 U.S. (10 Wall.) 604, 19 L.Ed. 1008 (1870), the Supreme Court held that national banks may, as an incidental power, engage in the practice of certifying checks. The Court there recognized the great similarity between the activity of certifying checks and the express power granted by the National

Bank Act to discount and negotiate bills of exchange.[7]

In First National Bank v. National Exchange Bank, 92 U.S. 122, 127, 23 L. Ed. 679 (1875), the Court held that the power to acquire stock in settlement of a claim arising out of a legitimate banking transaction is an incidental power of national banks. In Wyman v. Wallace, 201 U.S. 230, 243, 26 S.Ct. 495, 50 L.Ed. 738 (1906), the Court held that national banks may, as an incidental power, borrow money. The Court referred to a line of cases which trace back to Auten v. United States Nat. Bank, 174 U.S. 125, 141, 142, 19 S.Ct. 628, 43 L.Ed. 920 (1899), in which the Court had noted that a greater part of banking practice was "in strict sense borrowing" and that several of the express powers granted to banks created a debtor-creditor relationship.

In Miller v. King, 223 U.S. 505, 510–511, 32 S.Ct. 243, 56 L.Ed. 528 (1912), the Court held that national banks may, as an incidental power, collect a judgment on behalf of a depositor.[8] Similarly, in Clement National Bank v. Vermont, 231 U.S. 120, 139–140, 34 S.Ct. 31, 58 L.Ed. 147 (1913), the Supreme Court held that national banks may, as an incidental power, pay taxes on behalf of depositors. As the Court there indicated, this activity is directly related to the express power of national banks to receive deposits.

In First National Bank v. Hartford, 273 U.S. 548, 559–560, 47 S.Ct. 462, 71 L.Ed. 767 (1927), the Court found that the sale of mortgages and other evidences of debt, acquired in the exercise of the express power to loan money and to discount and negotiate other evidences of debt, was permissible under the bank's incidental powers. In Colorado Nat. Bank v. Bedford, 310 U.S. 41, 49, 60 S.Ct. 800, 84 L.Ed. 1067 (1940), the Court held that the operation of a safe deposit business was embraced within the bank's incidental powers because the operation of a safe deposit business is virtually identical to the express statutory authority of national banks to accept special deposits. 12 U. S.C. § 133.

Finally, in Franklin Nat. Bank v. New York, 347 U.S. 373, 375–377, 74 S.Ct. 550, 98 L.Ed. 767 (1957), the Court held that national banks were entitled to advertise the word "savings" because such advertising was incidental to the express power of such banks to receive time and savings deposits and to pay interest thereon.

■ In our opinion, these decisions amply demonstrate that a national bank's activity is authorized as an incidental power, "necessary to carry on the business of banking," within the meaning of 12 U.S.C. § 24, Seventh, if it is convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act. If this connection between an incidental activity and an express power does not exist, the activity is not authorized as an incidental power.

---

7. Said the Court in *Merchants' Bank*:
   "The practice of certifying checks has grown out of the business needs of the country. They enable the holder to keep or convey the amount specified with safety. They enable persons not well acquainted to deal promptly with each other, and they avoid the delay and risks of receiving, counting, and passing from hand to hand large sums of money." 77 U.S. (10 Wall.) at 648.

8. In *Miller*, the Court reasoned:
   "[National banks] may do those acts and occupy those relations which are usual or necessary in making collections of commercial paper and other evidences of debt. It is both usual and proper for the legal title to negotiable instruments to be vested in a bank by mere endorsement for purposes of collection, holding the proceeds as the endorser directs."

   .    .    .    .

   "There was nothing in this transaction which was so disconnected with the banking business as to make it in violation of Rev.Stat. § 5136 [12 U.S.C. § 24, Seventh] even if the defendant could raise such question." 223 U.S. at 510, 511, 32 S.Ct. at 244.

This brings us to a consideration of the question of whether the operation of a travel agency business, such as that conducted by South Shore, may reasonably be said to be convenient or useful in connection with the performance of one of the bank's established activities in the exercise of its express powers.

While the Comptroller and South Shore do not concede that such a relationship between an incidental and an express power must exist, they suggest ways in which they believe a travel agency business is directly related to a national bank's normal banking operations. In presenting this view, they pursue two lines of argument. One of these is an effort to equate the basic functions performed by travel agencies with functions which have historically been performed by banks. The other is based on the premise that a substantial number of banks have, for a long time, been providing travel agency services.

With regard to the first of these contentions, defendants assert that the basic functions performed by travel agencies consist of: (1) procuring carrier passage and other travel accommodations by acting as agent for passengers and carriers, and (2) providing various informational services to the traveler. Defendants then assert that both of these "basic" travel agency functions are only particular applications of the broad agency and informational services which banks traditionally offer among their "congeries of services."

In our view this analysis unrealistically minimizes the basic functions of a travel agency business and unjustifiably exalts the agency and informational functions of national banks.

The operation of a travel agency in the United States today is a highly complex activity. *See* note 4 above. Some of the aspects of that business are close-ly regulated under the supervision of the Civil Aeronautics Board, the Interstate Commerce Commission, and the Federal Maritime Commission.[9] It is true that a travel agent acts as an agent for the traveler, but it also acts as an agent for carriers. A travel agency provides informational service for the traveler, but it also solicits travel business, advertises and in general promotes the interests of its carrier principals. More importantly, the agency and informational services a bank travel agency renders are pursuant to its own interest in making its travel department profitable, wholly apart from the bank's normal banking operations.

On the other hand, while national banks provide certain agency and informational services they are normally of a kind which are germane to the financial operations of the bank in the exercise of its express powers. There are, of course, instances in which banks have, as a convenience to their regular customers, and without additional compensation, obtained railroad, steamship or airline tickets for such customers, or provided information helpful to such customers in connection with their travels. But incidental good will service of this kind cannot reasonably be equated with the operation of a modern travel agency for profit. In short, there is a difference between supplying customers with financial and informational services helpful to their travel plans and developing a clientele which looks to the bank not as a source of general financial advice and support but as a travel management center.

The Comptroller asserts that one of the central purposes of the National Bank Act, enacted during the Civil War, was to serve as a unifying force to the nation and that the draftsmen of the Act contemplated that the Act would fulfill its unifying purpose by, among other

---

9. There is now pending before Congress, as S. 2577, 92d Cong., 1st Sess. (1971), legislation which would create an elaborate system of travel agent registration and regulation. This legislation would create a new office within the Department of Transportation to administer this regulatory system. This bill passed the Senate on June 29, 1972, and was referred to a House Committee.

things, facilitating interstate commerce and "facilitating travel." [10]

As a reading of these documents demonstrates, the objective of establishing a "unifying force" and "facilitating travel" were viewed in those early years, not as being attainable through the operation of a banking travel service, but as being attainable through the establishment and circulation of a national currency. Prior to the National Currency Act of 1863, now also known as the National Bank Act, there was no national currency and financial transactions were largely conducted through the medium of bank notes issued by state banks. The establishment of a national currency provided a form of legal specie acceptable throughout the country, and it was this which provided the desired "unifying force" and assisted in "facilitating travel."

South Shore asserts that banks in the United States have been offering travel services to their customers since at least 1865, when the Security National Bank in Sheboygan, Wisconsin, formally established its bank travel department. According to South Shore, in the ensuing years of the nineteenth century and the period preceding World War I, numerous other banks began to offer travel services largely to accommodate the great number of imigrants arriving in this country. The travel service then rendered by banks involved assisting immigrants in remitting money to families in their native lands, obtaining steamship tickets for relatives, and transmitting these prepaid tickets to foreign addresses. Immigrants during this period made periodic trips "home" and needed travelers' checks, letters of credit, foreign currency and other banking assistance.

The limited and largely uncompensated services of this kind, rendered by banks during this period, bear very little resemblance to the functioning of a modern travel agency. Moreover, it was not until 1959 that the Comptroller of the Currency ruled that national banks could engage in a regular travel agency business.

On December 11, 1935, in answer to an inquiry, the Comptroller's office issued a letter stating that it would not be lawful for a national bank to invest its funds in tickets for travel of any kind for the purpose of reselling them. Continuing, the Comptroller stated that:

"There is no legal objection, however, to a national bank acting as collection agent for a steamship, railroad or other company, its sole duty being to deliver tickets and place the amount collected to the credit of the company."

It is apparent that the travel services rendered by a bank, as thus envisioned, were relatively limited as compared to those rendered by a travel agency today, and that they were services closely related to a bank's normal functions under its express powers.

In 1949, the Comptroller issued his Rule 67, indicating that at that time national banks were deemed to be without power to operate a travel agency business.[11]

---

10. In support of this assertion the Comptroller cites, and quotes from, the Annual Reports of the Secretary of the Treasury for 1862 (December 4, 1862, pp. 20–21, Senate Executive Doc. No. 1, 37th Cong., 3rd Sess.), and for 1863 (Dec. 10, 1863, p. 19, House Executive Doc. No. 3, 38th Cong., 1st Sess.). The words "facilitating travel" appear in the Secretary of the Treasury's Annual Report for 1863, where, in reviewing the purposes of the Act, the Secretary said:

"Impelled, therefore, by a profound sense of the present necessity of a national currency to the successful prosecution of the war against rebellion, and of its utility at all times in protecting labor, cheapening exchanges, facilitating travel, and increasing the safety of all business transactions . . . the Secretary recommended, in two successive reports, the authorization of national banking associations, to which the capital of the corporations now issuing notes for circulation might be transferred, with advantage to the parties in interest as well as to the general public."

11. Rule 67 stated, in pertinent part:
"It is the position of this office that a national bank does not have the legal right

In 1957 and 1958, the Comptroller studied and reëvaluated the subject of travel services vis-à-vis national banks. At that time there were apparently about forty national banks which were engaged in the performance of travel services. On the basis of his survey, the Comptroller, in January, 1959, determined that national banks could properly continue to provide travel services "as they have been doing for many years. . . ." The quoted words apparently have reference to the activities of the forty or so national banks, out of several thousand then in operation, some of which had reported they were then rendering general travel agency services. This 1959 ruling became 12 C.F.R. § 7.1 and Paragraph 9700 of the Comptroller's Digest of Opinions.

In 1963, Paragraph 7475 of the Comptroller's Manual for National Banks was issued, and later became 12 C.F.R. § 7.7475, and 12 C.F.R. § 7.1 was deleted as unnecessary. It was in 12 C.F.R. § 7.7475 that the Comptroller finally sanctioned full travel agency operations by national banks.

Despite the Comptroller's sanction, since 1959, of the operation of travel agency businesses by national banks, only one hundred twenty-two out of about four thousand seven hundred national banks were engaged in that business in 1967, when this action was brought. This is far from persuasive evidence that the operation of travel service departments is useful and convenient to the functioning of normal banking services under the express powers granted by the National Bank Act.

The Comptroller and South Shore urge us, on the authority of Inland Waterways Corp. v. Young, 309 U.S. 517, 524–525, 60 S.Ct. 646, 84 L.Ed. 901 (1940), and Investment Co. Institute v. Camp, 401 U.S. 617, 626–627, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), and other cases, to accord great weight to the Comptroller's construction, in 12 C.F.R. § 7.7475, of the "incidental powers" provision, 12 U.S.C. § 24, Seventh.

We fully recognize the principle to which defendants refer. But, as the Supreme Court said in Zuber v. Allen, 396 U.S. 168, at 192–193, 90 S.Ct. 314, 327, 24 L.Ed.2d 345 (1969):

"While this Court has announced that it will accord great weight to a departmental construction of its own enabling legislation, especially a contemporaneous construction . . . it is only one input in the interpretational equation. . . .

"The Court may not, however, abdicate its ultimate responsibility to construe the language employed by Congress." [12]

to act as agent or representative of transportation companies in the operation of a regular travel agency, bureau or service in the same manner as private travel agencies are operated as a business for profit. However, if the bank does not hold itself out to the public as operating a travel agency, bureau or service, but merely undertakes to assist customers of the bank who wish to travel in obtaining reservations or accommodations, we believe that such activity is within the power of the bank as an incident to the fostering of good will by gratuitous public relations service."

12. A particularly pertinent application of this view is found in Webster Groves Trust Co. v. Saxon, 370 F.2d 381 (8th Cir. 1966), where the Eighth Circuit, in upholding the right of judicial review of the Comptroller's action in issuing a new national bank charter, said:

" 'The courts, however, have held that judicial cognizance of a controversy with the Comptroller may be taken and judicial power exercised to keep the Comptroller within statutory bounds. . . . This rule keeps the Comptroller from being a free-wheeling agency dispensing federal favors; and it gives some assurance that he will render principled decisions within the rule of law laid down by Congress.' " *Id.* at 387, quoting Whitney National Bank v. Bank of New Orleans, 379 U.S. 411, 427–428, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965) (Douglas, J., dissenting).

The reference in this excerpt from the *Webster Groves Trust Co.* opinion to the need for keeping the Comptroller from

In view of the many consideratiᴏns which lead to a contrary conclusion, as reviewed above, the lack of essential articulation supporting the Comptroller's 1963 ruling, issued without opinion or accompanying statement,[13] and in the light of the lack of uniformity in the Comptroller's own interpretation of the statute, we conclude that the Comptroller's current interpretation, as embodied in 12 C.F.R. § 7.7475, is not entitled to dispositive deference.

Defendants urge that Congress has long been aware of the Comptroller's regulation authorizing national banks to provide travel agency services and has often considered, but failed to enact, proposed legislation which would have amended the Act expressly to prohibit national banks from providing such services.[14]

As the Supreme Court said in Zuber v. Allen, 396 U.S. 168, 185, 90 S.Ct. 314, 323, 24 L.Ed.2d 345 (1969), "[l]eg-

---

being "a free-wheeling" agency, calls to mind the fact that, in 1963, when James J. Saxon, then the Comptroller, promulgated the ruling which was later to become 12 C.F.R. § 7.7475, he, in the same year, forced a number of bold and radical changes in established bank policy and, as plaintiffs correctly put it, "opened up new avenues of exploration for national banks." During that year, Comptroller Saxon, in addition to authorizing national banks to engage in the travel agency business, allowed them to enter the insurance business, underwriting business, mutual investment fund business and the armored car and courier business.

Every one of these other 1963 rulings which have been challenged on their merits have subsequently been struck down by the courts. Saxon's 1963 ruling that national banks could enter the insurance business was overturned in Georgia Ass'n of Independent Ins. Agents, Inc. v. Saxon, 268 F. Supp. 236 (N.D.Ga.1967), aff'd, 399 F.2d 1010 (5th Cir. 1968). Saxon's 1963 ruling that national banks could underwrite government securities was invalidated in Baker, Watts & Co. v. Saxon, 261 F. Supp. 247 (D.D.C.1966), aff'd 129 U.S. App.D.C. 173, 392 F.2d 497 (1968). His 1963 ruling that national banks could operate a mutual investment fund was set aside in Investment Company Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). His 1963 ruling that national banks could set up an armored car service and deposit receptacles at various locations despite state branch banking was overturned in First National Bank v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969). In none of these cases, despite the fact that agency expertise was more directly involved than it is here, was the ruling of the Comptroller permitted to control over what the court thought was the correct construction of the relevant statute.

13. *See* Investment Company Institute v. Camp, 401 U.S. 617, 627–628, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971).

14. In 1957 and 1959, bills were introduced in Congress that would have prohibited national banks from furnishing travel agency services. H.R. 5414, 85th Cong., 1st Sess. (1957) ; H.R. 2424, 86th Cong., 1st Sess. (1959). The bills were not passed. In 1964, a subcommittee of the House Banking and Currency Committee held hearings on legislation to prohibit banks from engaging in certain non-banking services. (H.R. 9548 and H.R. 9822, 88th Cong., 2d Sess.). The American Society of Travel Agents ("ASTA") asked the subcommittee to amend the proposed legislation to add travel agency services to the list of prohibited activities. ASTA's proposal was not adopted by the subcommittee.

In 1966, the same subcommittee again held hearings on similar legislation. (H.R. 112, et al., 89th Cong., 2d Sess.). ASTA's proposal was once more presented, and rejected by the subcommittee. In 1967, a bill was introduced in Congress that would have prohibited national banks from furnishing travel agency services. (H.R. 11077, 90th Cong., 1st Sess.). The bill was not passed. In 1969, the House Banking and Currency Committee held hearings on legislation which would have amended the Bank Holding Company Act to prohibit subsidiaries of bank holding companies from engaging in nonbanking activities. (H.R. 6778, 91st Cong., 1st Sess.). Independent travel agents again presented their case to the Committee. Hearings were held but the Committee did not take action on their behalf.

In 1970, the Senate Committee on Banking and Currency held hearings on S. 1052, 91st Cong., 2d Sess., to amend the Bank Holding Company Act. The result was the enactment of 12 U.S.C. § 1843(c) (8), which entrusted to the Federal Re-

islative silence is a poor beacon to follow in discerning the proper statutory route." [15] From the materials which are before us we cannot determine whether any committee or subcommittee of Congress rejected, on the merits, the proposal to overturn the Comptroller's ruling that national banks could engage in the travel agency business. It may well have been that this ruling was simply viewed as an inconsequential aberration which would probably involve very few national banks and hence was not deserving of legislative attention. We think that, under the circumstances, a much more reliable guide to the correct statutory construction of 12 U.S.C. § 24, Seventh, is to be found in what the national banks, as a whole, were doing about the travel agency business. As indicated above, all but a tiny fraction of them have avoided this activity.

South Shore argues, in effect, that the district court erred in failing to apply the "legal interest" test to plaintiffs' claim and in failing to hold that the National Bank Act gives petitioners a

'legal interest' that protects them against the performance of travel agency services by national banks.[16] In this connection, South Shore calls attention to the following language in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 158, 90 S.Ct. 827, 832, 25 L.Ed.2d 184 (1970):

> "Whether anything in the Bank Service Corporation Act or the National Bank Act gives petitioners a 'legal interest' that protects them against violations of those Acts, and whether the actions of respondents did in fact violate either of those Acts, are questions which go to the merits and remain to be decided below."

South Shore thus contends that this legal interest test is a requirement in addition to standing which must be met before plaintiffs may prevail in this action. It is of course established that plaintiffs have standing to prosecute this suit.[17]

The subsequent decision of the Supreme Court in Investment Co. Institute

---

serve Board the task of determining, under the Bank Holding Company Act, those activities of *holding company* subsidiaries which are "so closely related to banking or managing or controlling banks as to be a proper incident thereto."

Concerning this provision, Dr. Arthur Burns, then Chairman of the Federal Reserve Board, testified:

"In the Board's judgment, authorized subsidiaries *might well include those* . . . *acting as travel agents or is-*suing travelers checks. . . . S.Rep. No.91–1084, 91st Cong., 2d Sess. 13 (1970).

As yet, the Federal Reserve Board has not issued regulations concerning bank subsidiaries and travel agency services.

15. The Court added, in *Zuber:*

"The verdict of quiescent years cannot be invoked to baptize a statutory gloss that is otherwise impermissible. This Court has many times reconsidered statutory constructions that have been passively abided by Congress. Congressional inaction frequently betokens unawareness, preoccupation, or paralysis. 'It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law.' Girouard

v. United States, 328 U.S. 61, 69, 66 S.Ct. 826, 90 L.Ed. 1084 (1946). Its significance is greatest when the area is one of traditional year-by-year supervision, like tax, where watchdog committees are considering and revising the statutory scheme. Even less deference is due silence in the wake of unsuccessful attempts to eliminate an offending interpretation by amendment. *See, e. g.,* Girouard v. United States, *supra."* 396 U.S., at 185–186, n. 21, 90 S.Ct., at 324.

16. The Comptroller does not join South Shore in advancing this argument.

17. South Shore cites Tennessee Electric Power Co. v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939), and Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938), in support of its "legal interest" argument. However, these cases were decided when the legal interest factor was regarded as a part of the standing to sue question. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), rejected the "legal interest" formula as a prerequisite to standing to sue.

v. Camp, 401 U.S. 617, 620–621, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) indicates to us that the sole question for the merits is whether Congress has permitted the travel agency business as presented here. This would seem to indicate that further establishment of harm was not necessary.

But, in the event it is, we think harm to plaintiff was amply established here. While the district court did not expressly find that such harm is being sustained by plaintiffs we think that this is implicit in the district court decision. That court specifically held that there was no genuine issue of material fact. This would appear to establish, for the purposes of plaintiffs' motion for summary judgment, the factual recital, in the affidavit of Albert E. Desaulniers, filed in support of plaintiffs' motion, that South Shore's travel business has adversely affected the affiant's travel agency business. Indeed, South Shore does not appear to contend otherwise on this appeal.

■■■ We conclude that the district court did not err in entering a declaratory judgment to the effect that it is illegal for a national bank to operate a full-scale travel agency since such an operation is not an exercise of the incidental powers referred to in 12 U.S.C. § 24, Seventh. For the same reason the district court did not err in determining that 12 C.F.R. § 7.7475 is invalid to the extent that it is construed by the Comptroller as authorizing a national bank to operate a full-scale travel agency.[18] These determinations in no way limit banks in rendering banking services for travelers, such as the sale of travelers' checks and foreign currency, the making of travel loans, issuance of letters of credit, and providing gratis travel information.

In view of these determinations the district court did not err in permanently enjoining South Shore from engaging in the travel agency business and in requiring South Shore to divest itself of its travel department.

The district court ordered that divestiture be complete within six months after this judgment becomes final. South Shore complains that six months is far too short a time for it to divest itself of its travel department without substantial loss and extreme difficulty. We see possible merit in South Shore's representations as to this although we do not accept the bank's suggestion that ten years be allowed for divestiture.

In our view the divestiture should be reasonably expeditious, but a limit should not be set which would be oppressive or inequitable. Our approval of the divestiture feature of the judgment is given with the qualification that the district court entertain and seriously consider any factual presentation South Shore wishes to make in the direction of lengthening the time for divestiture.

Subject to the qualification just stated, the judgment is affirmed.

18. In this recital of the judgment, the district court actually referred to 12 C.F.R. § 7.1, which has been superseded by 12 C.F.R. § 7.7475.