**AMERICAN BANKERS ASSOCIATION et al., Plaintiffs,**

v.

**Lawrence B. CONNELL, Jr., et al., Defendants.**

Civ. A. No. 77–2102.

United States District Court, District of Columbia.

March 7, 1978.

William H. Smith, Johanna M. Sabol, Michael F. Crotty, Meyer Eisenberg, Leonard J. Rubin, Christine E. Carnavos, Washington, D. C., for plaintiffs.

J. Leonard Skiles, National Credit Union Administration, Joseph L. Gibson, Lewis K. Wise, Dept. of Justice, Washington, D. C., Fred M. Haden, Brian H. Rhatigan, Vienna, Va., for defendants.

## MEMORANDUM

AUBREY E. ROBINSON, Jr., District Judge.

This is an action by the American Bankers Association and Tioga State Bank against the National Credit Union Administration ("NCUA") and its Administrator, challenging the statutory authority of Federal Credit Unions ("FCUs") to operate share draft programs under the Federal Credit Union Act (the "FCU Act"), 12 U.S.C. § 1751, *et seq.*[1] The matter is before the Court on the parties' cross-motions for summary judgment. For the reasons discussed below, the Court finds that there are no genuine issues of material fact and that Defendants are entitled to judgment as a matter of law.

A share draft is a demand draft which is drawn by a member on his credit union share account and which is made payable to third parties. Each share draft is payable through a particular commercial bank. The function of the payable-through bank is to

[1]. On February 17, 1978, this Court denied motions to intervene filed by the Independent Bankers Association of America (seeking intervention as party-plaintiff), Credit Union National Association, National Association of Federal Credit Unions, and the Consumer Federation of America (seeking intervention as parties-defendant). However, the Court granted these organizations leave to participate as amici curiae. The terms "plaintiff" and "defendant" used herein shall include reference to the positions of the amici.

receive share drafts through bank clearing channels and present them to the credit union for payment. Share drafts are similar in appearance to checks and other drafts in that they provide spaces for a date, the name of the payee, the amount of the draft, and the member's signature as drawer. The member fills in the share draft, signs it, and delivers it to the payee in return for goods or services or for cash. Because the accounts on which share drafts are drawn are share accounts, such accounts earn dividends in the same fashion as regular credit union shares. However, no dividends are paid on those funds that are withdrawn from the account by share draft or otherwise before the end of the dividend period. Share draft accounts are subject to the right of FCUs to require sixty (60) days advance notice of withdrawal.

FCU share drafts originated in 1974 as an experimental pilot program approved by NCUA. By late 1977 some 514 FCUs in at least forty-five (45) states were participating in share draft programs. In September 1976, the American Bankers Association filed an action challenging the legality of the experimental share draft program. That litigation was dismissed without prejudice after NCUA agreed to undergo rulemaking procedures and promulgate a formal rule governing share drafts. On December 8, 1977, NCUA published its final rule, which authorizes FCUs to continue establishing and implementing share draft programs.[2] Plaintiffs filed the instant lawsuit on December 9, 1977.

The issue before the Court is whether, consistent with the terms of the FCU Act and the general statutory scheme controlling federal financial institutions, the NCUA can authorize FCUs to utilize share drafts as a means of accessing members' accounts. A secondary issue in the case is whether the manner in which NCUA pro-

mulgated its regulation comports with the standards of the Administrative Procedure Act.

■ The Court begins with the proposition that a departmental construction of its own enabling legislation is entitled to great deference from the Courts. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The interpretation given the statute by the agency charged with its administration is sustainable as long as that interpretation has a reasonable basis in law. Only where there are compelling indications that the interpretation is plainly erroneous should a Court invalidate an administrative construction of a statute. *Espinoza v. Farah Manufacturing Company,* 414 U.S. 86, 94–95, 94 S.Ct. 334, 38 L.Ed.2d 287 (1974); *Zuber v. Allen,* 396 U.S. 168, 192–193, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); *Board of Dir. & Officers, Forbes Federal Credit Union v. National Credit Union Administration,* 477 F.2d 777, 784 (10th Cir. 1973).

■ It is uncontested that FCUs possess the power to authorize and regulate withdrawals from share accounts. The source for this power is no where found in the express provisions of the FCU Act.[3] Rather, such power must be inferred from the language of 12 U.S.C. § 1757(15), which grants FCUs the authority to "exercise such incidental powers as shall be necessary or requisite to enable [FCUs] to carry on effectively the business for which [FCUs are] incorporated." An activity is authorized as an "incidental power" if it is convenient or useful in connection with the performance of one of the institution's established activities pursuant to its express powers. *Arnold Tours v. Camp,* 472 F.2d 427, 432 (1st Cir. 1972).

---

**2.** See 12 C.F.R. § 701.34 at 42 Fed. Reg. 61977 (1977). The effective date of the rule was February 6, 1978, but implementation of the rule has been deferred pending resolution of the motions for summary judgment.

**3.** While 12 U.S.C. § 1757(6) gives FCUs the express authority to receive the funds of their

members for deposit into withdrawable share accounts, and makes those shares subject to the terms, rates and conditions established by the board of directors and the Administrator, the Act is completely silent as to how withdrawals may be requested or paid.

Defendants contend that the authority for FCUs to use share drafts procedures likewise can be inferred from the "incidental powers" clause of the FCU Act.[4] Plaintiffs argue that share draft powers fail to qualify as incidental powers under the *Arnold Tours* standard. Plaintiffs liken share drafts to checks and demand deposits and claim that absent express statutory authorization FCUs lack the authority to permit members to access their accounts by means of share drafts.

◾ Both sides focus too strongly on the mechanics of accessing accounts. What is important is not the method by which withdrawals are effected, but rather the type of account involved in this litigation: the traditional FCU share account.[5] There is no legal restriction on the amount or frequency of withdrawals from credit union share accounts. In the past, FCU members have had a variety of options available for withdrawing funds and making payments to third-parties out of their share accounts, including cash withdrawals, and withdrawals by travelers checks, by money order, or by credit union check. Further, it is not necessary that members make their withdrawals in person. Share drafts have been developed as a more convenient and efficient means by which FCUs can offer withdrawal and payment services, allowing FCUs to take advantage of advancements in computer technology.[6] Share drafts are simply a variation on established methods

of accessing members accounts, similar to previous procedures for credit union third-party payments, and similarly valid as part of the exercise of FCUs incidental powers under the FCU Act.[7] To rule otherwise would be to raise form over substance, to deny the history of the use of drafts in commercial practice, and to unreasonably limit the undisputed power of FCUs to honor and regulate share account withdrawals.

◾ Such a holding does not work violence with the statutory purposes for which FCUs were created. FCUs exist for the purposes of promoting thrift among members and creating a source of credit for provident or productive enterprises. 12 U.S.C. § 1752(1). There has been no suggestion that the share draft program, as presently conducted on an experimental basis, has adversely affected the viability of FCUs or the interests of FCU members. The Court is satisfied that the use of share drafts will serve the basic purposes of FCUs.[8]

Further, the Court is persuaded that a finding that share draft practices are among the incidental powers of FCUs is not inconsistent with the legislative history of the FCU Act or the general Congressional scheme controlling federal financial institutions. Legislative history in this case has minimal utility. On the one hand, there is no indication from the Congressional debates on the FCU Act and other related legislation that Congress has intended to

---

**4.** Defendants also argue that share drafts are expressly authorized under the FCU Act as part of the exercise of FCUs' powers to contract, 12 U.S.C. § 1757(1), or powers to receive and condition payments on shares, 12 U.S.C. § 1757(6). However, the Court is not persuaded that either express provision, by itself, extends to the accessing of members' share accounts by means of share drafts.

**5.** While share drafts differ from checks in certain respects, most notably in the 60 day notice provision which applies to share drafts, the distinction between share drafts and checks or demand deposits seems irrelevant to the Court. Share drafts may actually be equivalent to checks. In whatever manner share drafts are classified, however, the function of share drafts remains constant: share drafts are simply a method of accessing credit union share

accounts. The validity or invalidity of share drafts must be measured, therefore, in terms of the relationship between share drafts and share accounts.

**6.** The major advancement in the field has been the development of electronic funds transfer devices.

**7.** See in the context of state-chartered credit unions, the Court's discussion in *Iowa Credit Union League v. Iowa Department of Banking*, Civil No. CE 6–3152 (D.Iowa May 24, 1977), appeal docketed, No. 2–60827, Supreme Court of Iowa, July 8, 1977.

**8.** See the conclusions of the Administrator of NCUA, expressed at 42 Fed. Reg. 69178 (December 8, 1977).

prohibit FCUs from utilizing share draft procedures. Throughout the course of development by FCUs of various methods of withdrawal from members' share accounts, there has been total silence from Congress concerning the propriety of any of these methods. Congress has been well aware of the on-going share draft program for several years now,[9] and yet in passing sweeping amendments to the FCU Act in 1977 failed to include any provision evidencing disagreement with the NCUA's position regarding share drafts. When Congress has intended to proscribe conduct on the part of financial institutions, Congress has done so with dispatch and specificity. See 12 U.S.C. §§ 1464(b) and 1832.[10] Thus it might be possible to find an implied ratification by Congress of NCUA's approval of FCU share drafts. See *Massachusetts Mutual Life Ins. Co. v. United States,* 288 U.S. 269, 283, 53 S.Ct. 337, 77 L.Ed. 739 (1933); *Alabama Association of Insurance Agents v. Board of Governors of the Federal Reserve System,* 533 F.2d 224 (5th Cir. 1976).

On the other hand, measures which would have authorized certain third-party payment powers on the part of FCUs have been introduced in the Congress, but have failed to pass.[11] In addition, there is language in the Congressional discussions on the FCU Act and related legislation that Congress has intentionally deferred consideration of the issue of FCU third-party payment powers.[12] This deferred consideration is evident in the fact that there are presently pending before the Congress several pieces of proposed legislation which relate to FCU share draft powers.[13]

■ Congressional failure to specifically address the share draft issue and the spectre of future legislation on the subject do not mean that FCUs presently lack the authority to adopt share draft procedures. As noted earlier, share draft practices are valid as part of the exercise of the incidental powers of FCUs. If Congress eventually acts with regard to share drafts, Congress then will be making a policy judgment.[14] This Court cannot and will not indulge in such policy judgments. If accessing FCU members' accounts by means of share drafts is to be proscribed, it must be proscribed by the legislature.

■ The NCUA promulgated its final rule concerning share drafts, 12 C.F.R. § 701.34, after extensive rule-making which included the solicitation of written and oral views of numerous persons, organizations and banks, and which involved hearings in

9. Between 1974 and 1976, share drafts were called to the attention of the Congress during testimony before the House and Senate oversight committees on federal financial institutions on numerous occasions. See the subcommittee hearings cited in Defendants' brief in support of Defendants' motion for summary judgment, pp. 24–25.

10. With respect to the NOW account legislation, 12 U.S.C. § 1832, it is interesting to note that FCUs were expressly excluded from the definition of "depository institutions" covered by the statute.

11. See H.R. 8199 (1965) and 29 (1969), which would have given FCUs the authority to offer checking accounts for their members. See also H.R. 13077 (1976), which would have authorized FCUs to offer third-party payment accounts in states where state-chartered credit unions had that power. In addition, a provision in the proposed Credit Union Modernization Act of 1977 (123 Cong.Rec., p. H–166) would have amended 12 U.S.C. § 1757 to give FCUs the power to "sell, purchase or handle any money

transfer instrument to or for members," but did not pass.

12. See the remarks of Rep. J. William Stanton, Cong. Record, March 1, 1977, p. H–1525. See also the remarks of Senator Thomas McIntyre in the context of the NOW account legislation, Hearings, Senate Banking Committee, Subcommittee on Financial Institutions, 93d Cong., 1st Sess., March 30, 1973, p. 3.

13. See, for e. g., S. 2055, introduced on June 9, 1977, which would authorize the use of NOW Accounts by banks, savings and loans, and credit unions, and bring FCU share draft regulations into accord with regulations to be promulgated as to NOW Accounts.

14. Both sides make much about the competitive position of FCUs vis-a-vis commercial banks. However, there is at present no policy concern with respect to competitive balance reflected in the FCU Act. This is what distinguishes the case at hand from *Independent Bankers Association of America v. Smith,* 175 U.S.App.D.C. 184, 534 F.2d 921 (1976).

which plaintiffs and the various amici participated. The Court is not persuaded that the manner in which the rule was formulated is in any way violative of the provisions of the Administrative Procedure Act. In creating the NCUA, Congress directed the agency to be more responsive to the needs of credit unions and to provide more flexible and innovative regulation.[15] NCUA's actions with respect to share drafts are consistent with its mandate. The Court finds that NCUA's determination that share draft practices are in accord with the statutory purposes of FCUs and within the authority of FCUs under the provisions of the FCU Act has a rational basis and is not arbitrary or capricious or otherwise plainly erroneous.

For the above-stated reasons, the Court concludes that defendants are entitled to summary judgment herein.

15. See S.Rep.No. 518, 91st Cong., 2d Sess., 3 (1970).