The **PORT OF NEW YORK AUTHORITY,**
Appellant,

v.

**BAKER, WATTS & CO.** et al., Appellees.

No. 20870.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 25, 1967.

Decided March 8, 1968.

Mr. Daniel B. Goldberg, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Sidney Goldstein, New York City, was on the brief, for appellant. Messrs. James M. Henderson and Arthur L. Winn, Jr., Washington, D. C., also entered appearances for appellant.

Mr. Gerhard A. Gesell, Washington, D. C., with whom Messrs. W. Graham Claytor, Jr., and Cyril V. Smith, Jr., Washington, D. C., were on the brief, for appellees.

Before BAZELON, Chief Judge, and PRETTYMAN, Senior Circuit Judge, and TAMM, Circuit Judge.

TAMM, Circuit Judge.

The Banking Act of 1933[1] (also known as the Glass-Steagall Act of 1933) pro-

1. 48 Stat. 162 (1933).

hibits commercial banks[2] from underwriting or dealing in investment securities. Specifically excepted from that prohibition are bonds issued by the United States, certain federal agencies, and "general obligations of any State or of any political subdivision thereof." 12 U.S.C. § 24, Para. Seventh (1964).[3] The question presented here is whether bonds of the type issued by the Port of New York Authority[4]—obligations secured by all its resources but not by the taxing power—come within the exception. We hold that they do not.

The Comptroller of the Currency[5] issued regulations in 1963 authorizing national banks to underwrite and deal in what are generally called revenue bonds, including those issued by appellant Port Authority. Appellees, a group of investment bankers, brought suit in the District Court and sought both a declaratory judgment that the regulations were void and an injunction prohibiting the Comptroller from authorizing similar bank underwriting in the future. When the trial judge learned that the Federal Reserve Board had taken a position opposite that of the Comptroller as to the meaning of the contested clause, he invited the Board to appear as amicus curiae. Appellant intervened as a defendant and supported the Comptroller. Cross motions for summary judgment were made, and in ruling for the appellees the trial judge adopted the position of the Federal Reserve Board. Both defendants noticed an appeal, but the Solicitor General dropped the Comptroller's appeal.[6] Hence, the Port Authority appeal is the only one before us.

Appellees have raised a preliminary question as to Port Authority's standing to appeal. We feel that the question is foreclosed by International Union of Mine, Mill & Smelter Workers, Locals No. 15 v. Eagle-Picher Mining & Smelter Co., 325 U.S. 335, 338, 65 S.Ct. 1166, 89 L.Ed. 1649 (1945), where unions which had intervened in the Court of Appeals in support of an NLRB petition were held to have standing to appeal the petition's denial, even though the Board did not seek review.

## I

Following the collapse of the stock market in 1929 and the ensuing collapse of many of the nation's banks, Congress undertook a thorough study in order to discover the causes of the collapse and to propose and enact various preventive reforms. One of the principal evils discovered was the practice of banks functioning both as commercial and as investment banks through the use of banking affiliates. The temptations inherent in such a scheme were frequently overwhelming and drew many banks into conflict of interest dealings. Public clamor for reform was reflected in the campaign of the then Democratic candidate for President, Franklin D. Roosevelt: "Investment banking is a legitimate business. Commercial banking is another wholly separate and distinct legitimate business. Their consolidation and mingling is contrary to public policy. I propose their separation." 76 Cong. Rec. 1940 (1933). Several bills which had as their purpose separation of the two functions were introduced in Con-

2. Commercial banks include both state member banks of the Federal Reserve System, regulated by the Federal Reserve Board, and national banks, regulated by the Comptroller of the Currency.

3. 12 U.S.C. § 335 (1964) makes state member banks subject to the limitations imposed on national banks by 12 U.S.C. § 24, Para. Seventh (1964), cited in the text.

4. A bistate agency of the states of New York and New Jersey, established by Compact of April 30, 1921, between those states and consented to by Congress. 42 Stat. 174 (1921). It shall hereinafter be referred to as "Port Authority."

5. Hereinafter referred to as "Comptroller."

6. The Attorney General is charged with supervision of all litigation in which an officer or agency of the United States is a party. 28 U.S.C. § 516 (Supp. II, 1965-66). He has delegated to the Solicitor General authority to allow or disallow all such appeals. 28 C.F.R. §. 0.20 (b) (1967).

gress, and after lengthy hearings and debate the Banking Act of 1933 was adopted.

■ While no judicial construction of the Act's term "general obligations" has been found,[7] the trade meaning of the term clearly requires a full faith and credit obligation supported by the taxing power. FUNDAMENTALS OF MUNICIPAL BONDS 3 (3d ed. 1963); FUNDAMENTALS OF INVESTMENT 218 (Rice ed. 1926). Its construction by administrative authorities, however, has been less clear. The Comptroller has reversed his position with respect to the clause three times since the Act was passed, and the position to which he now adheres is opposed by the Federal Reserve Board. Thus, the two authorities charged with administering the Act have adopted, by formal regulation, conflicting interpretations of the same clause. In this setting we look, as a necessary aid to interpretation, to the Congressional debate which preceded the statute's passage. United States v. Great Northern R., 287 U.S. 144, 154, 53 S.Ct. 28, 77 L.Ed. 223 (1932).

All of the debate involving the term "general obligations" took place in the Senate on January 18, 19, and 24, 1933[8] during consideration of a predecessor bill in the session prior to that in which the Act was passed. The discussions encompassed both broad definitions of the contested phrase by the bill's floor manager and others and requests by various Senators about the potential eligibility, under the clause, of specific bonds issued by entities in their states. There is little dispute about the general definitions; our concern is with the applicability of those definitions to Port Authority bonds.

Many questions were asked with respect to specific issuers and issues, the characteristics of which are now and apparently were then unknown. Because an argument based on the debate con-

cerning such specific issues depends on the similarity between that issuer and its obligations and the Port Authority and its obligations, there is small value for us in those portions of the debate. One segment of the debate, however, dealt with Port Authority bonds. We consider it to be the only part sufficiently definite to be of assistance here, and we have set it out in full:

MR. COPELAND. Mr. President, what the Senator from Michigan has said raises another question in my mind. Does the Senator from Michigan mean that bonds issued by a city for a specific purpose—we will say the purpose of wiping out slums or the building of a subway—would not be usable in a national bank?

MR. COUZENS. They would not be unless the city guaranteed the bonds of the particular district. I can perhaps better illustrate it by giving an example. For instance, the street railways of Detroit had two options as to how to finance themselves. One was by issuing bonds secured by the property itself without the obligation of the taxpayers of the city of Detroit behind them; or they had the opportunity of issuing securities backed by the guaranty of the city. Under the reading of the bill, the street-railway bonds themselves would not be eligible unless the city guaranteed them. To put it in another way, using the illustration to which I referred a moment ago, the securities of any special assessment district which was solely responsible for the issue of bonds would not be general obligations under the interpretation of the bill as the Senator has just read it.

MR. COPELAND. Perhaps the Chicago drainage area would be an example.

MR. COUZENS. It would be an example, unless its bonds were guaranteed by all the taxpayers. In other words,

---

7. However, in 1908 the Oregon Supreme Court construed "general obligations" as requiring tax support. City of Eugene v. Willamette Valley Co., 52 Or. 490, 97 P. 817, 821 (1908).

8. The entire debate, insofar as is pertinent, is found at 76 Cong.Rec. 2000, 2090–93, 2400–07 (1933).

a district could be created, for instance, such as the Port Authority of New York, which for its securities pledges all the property within the district or has its obligations guaranteed by the State: They would be a general obligation under the interpretation of the bill.

MR. COPELAND. Would there be any doubt in the mind of the Senator about the securities of the Port Authority of New York, which is an interstate organization, in which both the States of New Jersey and New York are interested, being usable in the banks?

MR. COUZENS. It would depend entirely upon the terms. If the State of New York and the State of New Jersey combined to guarantee the securities issued, they would be general obligations under the terms of the bill.

MR. COPELAND. I think, Mr. President, I am satisfied with the answers I have received. Of course, from my standpoint, it would be a very great disadvantage if it were possible for a city or a county or any political subdivision of a State to have any question raised as to the usability of its securities with the national banks; but I have every right to believe, from the answers I have received from the distinguished Senator from Virginia and the Senator from Michigan, that there are no two thoughts regarding the meaning of the language to which I have referred.

MR. GLASS. I think the Senator from New York is correct as to that. I may elaborate by saying that in no event will there be any difficulty in the flotation of State, city and community securities in this country so long as it is profitable to engage in such flotation. The trouble with this country to-day is that it has been entirely too easy to float anything that comes along. Not only State and city securities and those of political subdivisions but worthless securities have been floated by the billions by high-powered salesmanship. 76 Cong.Rec. 2091 (1933).

Appellant contends Senator Couzens' statement that "[t]hey would be a general obligation under the interpretation of the bill" conclusively shows that Port Authority bonds come within the exception of the statute. Appellant says, first, the Senator *contrasted* the eligible Port Authority securities with those of the "Chicago drainage area" which would have been ineligible "unless * * * guaranteed by all the taxpayers." Second, when he said a district such as the Port Authority could pledge "all the property within the district" for its securities *or* have "its obligations guaranteed by the State," he intended the two requirements as *alternatives;* and meant that the presence of either would make the bonds eligible. This interpretation is buttressed by Senator Copeland's expression of satisfaction that Port Authority bonds came within the exception, and by Senator Glass' affirmation of his satisfaction.

The appellees back up one step and begin with Senator Couzens' example of the two methods of financing street railways in Detroit. The bonds, he said, would not be eligible if secured by the property itself. They would be eligible only if "the city guaranteed" them. Next, he confirmed that Senator Copeland's example of ineligible securities, bonds of the Chicago drainage area, was correct unless the bonds were "guaranteed by all the taxpayers." Against this background, Senator Couzens gave another illustration: bonds issued by a "district" such as the Port Authority. Port Authority projects, like the street railway, could be financed in two ways, only one of which would make its securities eligible under the statute. The Authority could pledge all the property in its district or have its obligations guaranteed by the state. Only in the latter instance would its bonds be eligible. This interpretation is also supported by Senator Couzens' answer to Senator Copeland's final question about the status of Port Authority bonds: "It would depend entirely upon the terms. If the State of New York and the State of New Jersey

combined to guarantee the securities issued, they would be general obligations under the terms of the bill."

Senator Copeland's satisfaction may have been engendered by a mistaken belief that Port Authority bonds were guaranteed by the states or he may have simply misunderstood Senator Couzens' answer. What it was, we cannot say. When we view the colloquy as a whole, however, it seems likely to us that Senator Couzens was making a *parallel* between the street railway example and the Port Authority example and that bonds of the latter were to be eligible like those of the first, only if they were guaranteed by tax support.

Appellant has made additional arguments regarding the debate. Its basic contention is that the term "general obligations" imports only a requirement that an issuer back its bonds with a pledge of full faith and credit, thereby placing all its resources behind the bonds. Port Authority obligations, it urges, *are* backed by full faith and credit, since the revenues from all its projects are pledged. On the other hand, the obligations of an issuer which has the taxing power are not full faith and credit obligations if the power is withheld. Many statements in the debates requiring a "guarantee by the city" or the like, it is argued, obviously related to issuers with tax power whose obligations could not have qualified without a pledge of the tax revenues. Appellant argues that these statements, hence, should not be read to exclude from eligibility, obligations of issuers without tax power like the Port Authority, which still may pledge full faith and credit. The argument seems rational; but it is too much a *rationale,* which substitutes conjecture for absent expressions of intent, and for that reason we reject it.

Closely related to this, is an elaborate argument which appellant makes concerning references in the debate to "special assessment" and "improvement" districts. The nature of the two types of district was not clear and when some Senators spoke of one, many Senators envisioned the other. Thus, appellant contends that in many statements indicating intent to have bonds "guaranteed by the people" the speaker had special assessment districts in mind. The issuers of those bonds are not the districts, but municipalities, which of course have the taxing power and may not withhold it consistent with a pledge of full faith and credit. Improvement districts, in contrast, are political subdivisions and issue bonds themselves, as does the Port Authority. Such a district's bonds, appellant urges, are "general obligations," if backed by all its resources.

This part of the debate in the Senate is simply too imprecise to support the argument advanced by appellant and cannot be relied upon in construing the statutory exception in question. Even if we were to accept the argument, we would still be left to speculate about the extent to which the special assessment and improvement districts and their bonds resemble the Port Authority situation. This we refuse to do.

Congress' broad purpose in granting eligibility to general obligations of states and political subdivisions was clearly to limit bank underwriting to issues of unquestioned financial integrity. Appellant correctly points out that its bonds have a higher rating by financial services than do the bonds of New York City, an issuer possessing the taxing power, and accordingly argues that its bonds fulfill the general purpose which Congress had in mind. We do not quarrel with the observation; we feel, though, because it tends to go to the *desirability* of making the bonds eligible, that it would be more properly addressed to Congress than to this court.

▇ When the Glass-Steagall Act was under consideration, "revenue bonds" were a new form of public financing, and it is likely that few of the members were familiar with their characteristics. The primary matters of concern were the obligations of certain types of special assessment and improvement districts, neither of which were necessarily analogous to bonds of the Port Authority.

The only specific reference to Port Authority bonds tends to show an intent to exclude them from the banks. We conclude, on balance, that the debate presents no clear intent by Congress to include within the exception the type of bonds issued by the Port Authority.

## II

We turn now to an examination of interpretations of the contested phrase made in various administrative rulings.

Before enactment of the Glass-Steagall Act, both the Federal Reserve Board, in 1915, 1915 Fed.Res.Bull. 41, and Congress, in the McFadden Act of 1927, 44 Stat. (Part 2) 1226, had used the term "general obligations" as requiring tax support. The latter contained a similar exception to that in the Glass-Steagall Act, but it applied only to "investment securities," id est, the Act limited a national bank's holdings of obligations of any one obligor to 25% of its capital and surplus, but "general obligations of any State or of any political subdivision thereof * * *" were excepted from the limitation. On November 29, 1932, seven months before the Glass-Steagall Act was passed, the Comptroller issued a ruling under this provision, holding that Port Authoritiy bonds were ineligible for purchase by national banks beyond the specified percentage limitation because they were not general obligations of states or of any political subdivision thereof.[9]

Following passage of the Act, in October 1934, the Comptroller, in response to a request by an investment securities company, stated that the general practice of his office was to consider the term "general obligations" as requiring tax support.[10] However, in November 1934, the Comptroller ruled specifically that Port Authority bonds were "within the exceptions of Paragraph Seventh * * * [of the Act], particularly so much of said exception as refers to 'general obligations of any State or of any political subdivision thereof'."[11] Appellant argues that the October ruling was consistent with the November ruling (the same Comptroller made them both), in that the former dealt with securities of issuers with tax power. Since full faith and credit requires a pledge of all available resources, such issuers could not have maintained such a pledge without tax support. We find this a strained interpretation because there is nothing in the ruling indicating that it was limited to obligations of issuers having the taxing power.

On June 11, 1937, the Comptroller issued two rulings involving non-taxing political subdivision issuers,[12] declaring the obligations of one eligible and the other ineligible. The distinction was that the obligations of the Triborough Bridge Authority were "payable from any and all funds of the issuer without restriction" while those of the California Toll Bridge Authority were restricted to payment out of "the revenues of particular projects." Thus the former were "general obligations" while the latter were not.[13]

The Comptroller changed his position with respect to the Triborough Bridge Authority securities on March 1, 1938, because "securities issued by agencies of the State, such as Triborough Bridge Authority, * * * [are] *not securities issued by a political subdivision* of the State."[14] (Emphasis added.) The change of position, hence, resulted *not*

9. Letter ruling from Deputy Comptroller John L. Procter to J. F. Fowler, Nov. 29, 1932.

10. Letter ruling from Comptroller J. F. T. O'Connor to J. D. Van Hooser & Co., Oct. 23, 1934.

11. Letter ruling from Comptroller J. F. T. O'Connor to the National City Bank, Nov. 21, 1934.

12. The rulings were contained in two separate letters from Acting Comptroller William Prentiss, Jr. to Hewes, Prettyman and Awalt, June 11, 1937.

13. Letter ruling from Executive Assistant Counsel to the Comptroller, Kit Williams, to the Honorable Jesse Jones, Sept. 8, 1937.

14. Letter ruling from Deputy Comptroller Marshall R. Diggs to John S. Linen, Mar. 1, 1938.

because the securities were no longer considered "general obligations" under the statute, but rather, because such issuers as the Port Authority, lacking the power to tax, were no longer deemed to be "political subdivisions."

It is not entirely clear when the last embers of that argument died,[15] but it is now conceded, and the trial judge found, that the Port Authority is a "political subdivision." Baker, Watts & Co. v. Saxon, 261 F.Supp. 247 (D.D.C. Dec. 14, 1966). Nevertheless, until the contested regulation was issued in 1963, the Comptroller's regulations adhered to the position that such issues were ineligible for bank underwriting because the issuers were not political subdivisions. Accordingly, the Comptroller's rulings and regulations from 1938 through 1963 did not address themselves to the issue here: whether certain obligations, concededly issued by political subdivisions, are "general obligations."

Shortly after the Comptroller changed position in 1963,[16] the Federal Reserve Board issued its first independent regulation on the matter, holding that "general obligations" required tax support, 29 Fed.Reg. 6061 (May 8, 1964), 12 C.F. R. § 208.109 (1967), and setting the stage for the present controversy.

We have, then, conflicting rulings made by the Comptroller during the period contemporaneous with enactment of the Act, a current ruling by the Comptroller in favor of the appellant and an equally current ruling in favor of the appellees. Against the background of the trade meaning of "general obligations" which clearly requires tax support and the Congressional debate which tends to show an intent to exclude Port Authority bonds from eligibility, we feel the Federal Reserve's is the more sound of the two rulings.

## III

During the past thirteen years, seven bills [17] designed to allow bank underwriting of obligations not secured by the taxing power have been introduced in the Congress; none has yet been enacted.[18] Because these bills sought to *amend* the statute in order to make revenue bonds eligible for bank underwriting and because none was passed, they are pressed upon us by appellees as a clear indication that, insofar as current Congresses are concerned, the 1933 Congress intended to exclude such bonds from eligibility.

We do not consider this to be the only permissible inference. Those introducing the bills may not have considered the intent of the 1933 Congress; rather, they may have simply wanted to allow bank underwriting of revenue bonds. Thus, we feel that no sound conclusion regarding the 1933 Congress' intent may be drawn from introduction of the bills.

15. Appellant contends that Com'r of Internal Revenue v. Shamberg's Estate, 144 F.2d 998 (2d Cir. 1944), cert. denied, 323 U.S. 792, 65 S.Ct. 433, 89 L.Ed. 631 (1945) conclusively held the Port Authority to be a "political subdivision," albeit within the framework of federal income tax statutes. We read the case, however, as holding the interest from Port Authority bonds to fall *either* within the exemption from federal income tax for interest upon the obligations of a state *or* within the same exemption for interest upon the obligations of any political subdivision of a state. See Judge Frank's dissent, 144 F.2d 1006, 1008.

16. 28 Fed.Reg. 9916 (Sept. 12, 1963), 12 C.F.R. § 1.3 (1967). A ruling specifically declaring Port Authority bonds eligible for bank underwriting was issued Nov. 6, 1965. 30 Fed.Reg. 14043 (Nov. 6, 1965), 12 C.F.R. § 1.167 (1967).

17. S. 2290, 84th Cong., 1st Sess. (1955); S. 2021, 85th Cong., 1st Sess. (1957); S. 3131, 87th Cong., 2d Sess. (1962); H. R. 5845, 88th Cong., 1st Sess. (1963); H.R. 7539 and 10445, 89th Cong., 1st Sess. (1965); S. 1306, 90th Cong., 1st Sess. (1967). See *Hearings on H.R. 5845, et al. Before the House Banking and Currency Committee*, 88th Cong., 1st Sess. (1963); *Hearings on H.R. 7539 Before the House Banking and Currency Committee*, 89th Cong., 1st Sess. (1965); S.REP. No. 713, 90th Cong., 1st Sess. (1967).

18. S. 1306, note 17 *supra*, was passed by the Senate, October 7, 1967. 113 Cong. Rec.S. 15921 (daily ed. Oct. 7, 1967). No House action has yet been scheduled.

IV

■ The debate, the administrative rulings and the accepted trade meaning of "general obligations," in the aggregate, convince us that Congress did not intend to include bonds of the type issued by the Port Authority within the exception it created for "general obligations of any State or of any political subdivision thereof." Exceptions in a remedial statute must be narrowly construed. Piedmont & N. R. Co. v. ICC, 286 U.S. 299, 311–312, 52 S.Ct. 541, 76 L.Ed. 1115 (1931). We hold the correct interpretation of Congressional intent to be that promulgated by the Federal Reserve Board, in defining "general obligations" as:

> obligations that are supported by an unconditional promise to pay, directly or indirectly, an aggregate amount which (together with any other funds available for the purpose) will suffice to discharge, when due, all interest on and principal of such obligations, which promise (1) is made by a Governmental entity that possesses general powers of taxation, including property taxation, and (2) pledges or otherwise commits the full faith and credit of said promisor; said term does not include obligations not so supported that are to be repaid only from specified sources such as the income from designated facilities or the proceeds of designated taxes. 12 C.F.R. § 208.109(d) (1967).

If policy considerations demand a different definition of "general obligations," Congress can promptly remedy the situation by enacting the pending legislation.

The judgment of the District Court granting appellees' and denying appellant's motion for summary judgment and enjoining the Comptroller from authorizing national banks to underwrite and deal in obligations of political subdivisions which are not "general obligations" within the definition of that term adopted above, is affirmed.

Affirmed.