ASSOCIATION OF DATA PROCESSING SERVICE ORGANIZATIONS, INC., and United Data Processing, Inc., Plaintiffs-Appellees,

v.

FEDERAL HOME LOAN BANK BOARD et al., Defendants-Appellants.

Nos. 76–2507, 76–2508.

United States Court of Appeals, Sixth Circuit.

Argued April 6, 1977.

Decided Dec. 5, 1977.

Daniel J. Goldberg, Harold B. Shore, Federal Home Loan Bank Bd., Washington, D. C., for Federal Home Loan Bank Bd.

Gerald W. Simmons, Paxton & Seasongood, Cincinnati, Ohio, Pierre J. LaForce, Washington, D. C., for plaintiffs-appellees.

Charles L. Cornelius, Jr., Cornelius, Collins, Higgins & White, Nashville, Tenn., for amicus curiae Tenn. Sav.

Gross C. Lindsay, Trimble, Cubbage, Lindsay & Thomason, Henderson, Ky., for amicus curiae Ky. Sav.

John V. Simshauser, Berry, Leighty & Simshauser, Macomb, Ill., for amicus curiae Sav. & Loan Ass'n.

Murray S. Monroe, Taft, Stettinius & Hollister, Cincinnati, Ohio, for Home Loan Bank of Cincinnati.

John R. Phillips, Cincinnati, Ohio, Juan A. del Real, Hill, Christopher & Phillips, P. C., George L. Christopher, Charles Lee Eisen, Washington, D. C., for intervenor-defendants.

Before WEICK, CELEBREZZE and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

The principal issue in this appeal is whether a federal home loan bank, with the approval of the Federal Home Loan Bank Board, may sell on-line data processing services to savings and loan associations

and other member institutions under the Federal Home Loan Bank Act of 1932, 12 U.S.C. §§ 1421–1449 (1970).

This suit was originally brought in 1973 by the Association of Data Processing Service Organizations, Inc. (ADAPSO) and by United Data Processing, Inc. (UDP) against the Federal Home Loan Bank of Cincinnati, the Federal Home Loan Bank Board and two individual members of that Board. The action sought declaratory and injunctive relief preventing the Cincinnati bank from providing on-line data processing services to member institutions and halting any further authorization of such services to other federal home loan banks by the Board and Board members.

On April 15, 1974, the Federal Home Loan Banks of Des Moines, Chicago, Pittsburgh, and New York were allowed to intervene and to answer as defendants in these proceedings. Extensive data were submitted by all parties and the issues were framed by cross motions for summary judgment. The appeals herein are from the summary judgment entered by the district court in favor of the plaintiffs. The summary judgment so entered provided in part:

> The providing of data processing services to member institutions is not an express power granted to Federal Home Loan Banks or the Board by the Federal Home Loan Bank Act. . . .
>
> The authorization issued by defendant Federal Home Loan Bank Board to defendant and intervenor Federal Home Loan Banks of Cincinnati, New York, Chicago, Des Moines, and Pittsburgh purporting to approve the data processing services of the defendant and intervenor Federal Home Loan Banks complained of in this action is illegal and void by reason of being in excess of statutory authority.
>
> . . .
>
> The Court permanently enjoins defendant and intervenor Federal Home Loan Banks of Cincinnati, New York, Chicago, Pittsburgh and Des Moines from engaging in the said data processing services for thrift institutions within their jurisdiction.

The Court permanently enjoins defendants Thomas R. Boman and Grady Perry, Jr. from authorizing the sale of commercial data processing services by Federal Home Loan Banks.

We affirm the judgment of the district court.

Plaintiff ADAPSO is a national trade association of data processing companies, some of which offer data processing services to member institutions of the federal home loan bank system. UDP is a member of ADAPSO which furnishes data processing services to certain institutions in Ohio, Kentucky, Indiana, and Tennessee.

The Federal Home Loan Bank Board is an independent federal agency charged by the Federal Home Loan Bank Act with general administrative and supervisory responsibilities for the federal home loan bank system. The Board is also responsible for chartering, organizing, and supervising federal savings and loan associations under § 5(a) of the Home Owners' Loan Act of 1933, 12 U.S.C. § 1464(a) (1970). Its members are appointed by the President with the consent of the Senate.

The federal home loan bank system today consists of twelve home loan banks and more than 4,300 "thrift" institutions which are members. These member thrift institutions consist primarily of federally- and state-chartered savings and loan associations, although certain building and loan associations, cooperative banks, homestead associations, insurance companies, and savings banks are also eligible for membership. 12 U.S.C. § 1424 (1970). To become and remain a member, an institution must subscribe to stock of the home loan bank in its district. While a large block of that stock had originally been purchased by the federal government due to inadequate capitalization during the Great Depression, at present the capital stock of each home loan bank is owned entirely by its members. Nevertheless federal home loan banks remain "federal instrumentalities," *Fahey v. O'Melveny & Meyers*, 200 F.2d 420, 446 (9th Cir. 1952), and enjoy certain tax immunities. 12 U.S.C. § 1433 (1970). The Board

also operates and directs the Federal Savings and Loan Insurance Corporation, an independent federal agency insuring savings accounts of all federal savings and loan associations and of certain state savings and loan associations.

In October, 1968, the Board began to authorize certain home loan banks to provide on-line data processing services to member institutions. On October 19, 1970, the Board adopted a general Resolution No. 70–327 which stated that "it may be necessary or desirable for federal home loan banks to provide on-line savings, mortgage, and general ledger services to member institutions." Under that resolution, however, such services were to be provided "only if acceptable comparable services are not otherwise conveniently available to member institutions." On January 27, 1972, the Board authorized the defendant Home Loan Bank of Cincinnati to provide on-line services to its member institutions. On the same day it rescinded Resolution No. 70–327, replaced two weeks later by the Board's Resolution No. 72–186. That new resolution deleted the earlier limitation that such services should be supplied only where comparable services were unavailable and instead simply stated that "to assure that the provision of such services will not be unduly injurious to other private entities providing similar services, the Board will closely monitor and control the data processing activities of the District Banks." The resolution, however, put no other restraint or limitation upon providing such services.

Pursuant to the above and similar resolutions, the Cincinnati bank and the intervening home loan banks have proceeded in varying degrees to furnish data processing services to member institutions.

Computerized data processing services enable member institutions to instantaneously record changes in savings accounts and mortgage loan accounts and to analyze large quantities of information. The services currently performed relate primarily to internal record keeping of the member institutions. Thrift institutions do not in turn offer their corporate clients access to the computer system nor do they make excess computer time available to other groups.[1] Traditionally the daily work of savings deposit and mortgage loan accounting in savings and loan associations was performed either by pen and ink calculations or by mechanical devices. On-line data processing utilizes computer terminals at the institution's teller windows which are connected in turn by telephone lines to a main computer located on the premises of a data processing service center. As each depositor's transaction is processed in the institution's teller terminal, that data is transmitted electronically to a main computer where the particular customer's account information is stored in the computer memory bank. The computer updates the account information and then instantaneously transmits the data back to the teller's window terminal, the entire process normally taking only one or two seconds. In somewhat like manner, the computer services handle all the accounting details with respect to payments on loans made by the particular institution.[2]

The home loan banks provide essentially the same types of data retrieval and analysis, though specific services may vary from bank to bank. For instance a home loan bank might offer the following reports with respect to savings deposit accounts: daily reports, listing in numerical sequence all transactions that occurred on a given day in every savings account of the member insti-

---

1. While there is no evidence that the thrift institutions are furnishing the data processing services to their members, other than indirectly by preparing IRS 1099 forms and receipts, etc., it appears in one instance that the Bank of Cincinnati was investigating the possibility of furnishing payroll processing for companies who were customers of member associations. Appendix 58.

2. "On-line" processing can be contrasted with "batch" processing, in which there is no direct "hook-up" between the customer and the computer center and where the raw data are transported, in "batch" form, to the computer service center on a periodic basis.

tution; summary totals of all savings transactions by type and branch, including statistics regarding new and closed accounts which are transmitted to the member each evening via its computer terminal; a recap of savings balances, also transmitted nightly by type of account; monthly reports listing in account number sequence detailed information concerning each of the member institution's savings deposit accounts; monthly reports of anticipated dividends by type of account and branch; a monthly report analyzing the monetary range of account balances; detailed reports concerning the accounts opened and closed during the preceding month. In addition dividend checks themselves are printed by computer and a journal list of all such checks is provided to the member. The bank also furnishes member institutions with IRS forms 1099 to be delivered to institution depositors and borrowers showing the amounts of dividends and interest paid to them during the preceding year.[3]

3. The comprehensive nature of the services sought to be offered is dramatically illustrated by a brochure circulated by the Cincinnati Home Loan Bank to its member organizations, which explains in part:

The Federal Home Loan Bank on-line service provides many benefits inherent in most sophisticated data processing systems. The following are just a few each member will experience when utilizing the most advanced on-line service available.

Lower operating costs and clerical savings/Greater Teller Efficiency/Increased Management Productivity/Tighter Control/Improved Auditability/Transaction Processing Flexibility/Efficient Customer Service and Conveniences/Built-In Growth Potential/Total Security of Records/System Flexibility to meet the individual requirements of each member/Simplified Training of new employees/Total system control by teller terminal/Maximum Accuracy at the lowest possible cost/Up-to-the-second Account Information/More Current Management Information.

Among the standard savings reports provided by the Cincinnati Bank service are the following:

Daily

On-Line Alpha Entry Report
Institution Daily Balance
Savings Transaction Journal
On-Line Record Changes
Exception Transaction Journal
Donor Transfer Report
Recipient Transfer Report
Miscellaneous Transaction Journal
Daily Management Summary
Dividends Calculated and Paid on Closed Accounts
Dividend Checks
1099 Forms
Audit Confirmations

Weekly

Alpha Entry File Maintenance Report
3 x 5 Cards
Alpha Must be Transmitted

Report
Transaction Frequency Analysis

Monthly

Savings Trial Balance includes: account range analysis, dormant and active accounts totals.

Quarterly

Prints Dividend Checks
Prints Dividend Register
Dividend Mailing Report

Yearly

Prints 1099 Forms

On Request

Savings Confirmation
Proxy Report
Teller Transaction Journal

With respect to standard mortgage reports, the computer can provide the following data:

Daily

Loan Transaction Journal
Exception Transaction Report
On-Line Record Change Report
On-Line Alpha Entry Report
Mortgage Billing Statements
Audit Confirmations
Year End Loan Statement

Weekly

Alpha File Maintenance Report, 5 x 8 cards

Monthly

Mortgage Trial Balance
Mortgage Purpose Code Analysis
Mortgage IRS Code Analysis
Mortgage Type of Security Analysis
Mortgage Interest Rate Analysis
Delinquent Notice
Delinquent Register
Late Charge Notices
Late Charge Register
Slow Loan Report
Foreclosure Report
New Loan Register
Closed Loan Register
Billing Statements (if not passbook)

## LEGAL INTEREST AND STANDING

■ While any challenge to the plaintiffs' standing to bring this action appears effectively to have been resolved in their favor by *Data Processing Service v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), defendants nevertheless claim that plaintiffs lack a protected "legal interest" entitling them to relief, a concept which is separate from that of standing. As the Supreme Court noted in *Data Processing*, the legal interest test goes to the merits, whereas the issue of standing concerns, "apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153, 90 S.Ct. at 830. While we suppose that the boundaries between concepts of standing, "case or controversy," and "legal interest" will always evade precise delineation, it seems clear that the Supreme Court intends that they be separately considered. In *M. B. Guran Co. v. Akron*, 546 F.2d 201 (6th Cir. 1976), we cited *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 456, 94 S.Ct. 690, 692, 38 L.Ed.2d 646 (1974), for the proposition that "the threshold question clearly is whether the . . . Act or any other provision of law creates a cause of action whereby a private party such as the respondent can enforce duties and obligations imposed by the Act; for it is only if such a right of action exists that we need consider whether the respondent had standing to bring the action and whether the District Court had jurisdiction to entertain it."

■ As observed in *Data Processing, supra*, the Administrative Procedure Act authorizes judicial review "except to the extent that—(1) statutes preclude judicial review, or (2) agency action is committed to agency discretion by law." 5 U.S.C. §§ 701, 702 (1970). In this respect we see no essential difference between the National Bank Act involved in *Data Processing* and the Federal Home Loan Bank Act here. There is no indication of a congressional intent to preclude judicial review under either statute. As noted in *Data Processing*, the APA has been construed as serving a broadly remedial purpose. 397 U.S. at 156, 90 S.Ct. 827. Likewise, we find no suggestion in the Federal Home Loan Bank Act that Congress intended the issues raised here to be committed solely to the discretion of the Home Loan Bank Board.

Even if the home loan banks are not considered federal "agencies" within the meaning of the APA, we think that a federal right of action can be implied from the Home Loan Bank Act under the guidelines set forth by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975):

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," . . . that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to employ such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

Application of the foregoing considerations, while precluding an implied right of action in *Cort v. Ash* and *M. B. Guran Co.*, appears clearly to support the existence of such a right of action here.

| Monthly | | Yearly | |
|---|---|---|---|
| | Capitalization Report | | Portfolio Analysis |
| | Participation Report | | Audit Confirmations |
| | Insurance Due Report | On Request | |
| | Tax Due Report | | Escrow Analysis Forms |
| Yearly | | | Past Due Notices |
| | Escrow Analysis | | Late Charge Notices |
| | Year End Loan Statement | | |

Section 11(e) of the Act, 12 U.S.C. § 1431(e) (1970), provides that "[n]o Federal Home Loan Bank shall transact any banking or other business not authorized by this chapter." The defendants admit that this provision was intended to prevent competition with "financial institutions" by not allowing the banks to serve the general public. Indeed at the time of the debate on the Act, Representative Luce observed:

> We do not now intend to embark the government in competition with savings banks, building and loan associations, and other lending agencies, . . . we do not now mean to embark the government in the lending of money to individuals
> . . . .

77 Cong.Rec. 2479 (1933). Clearly in 11(e) Congress sought to protect the competitive interests of other businesses as well as financial institutions. Under any construction ADAPSO is engaged in "other business" and falls within the broad class of institutions that this provision of the Act sought to protect. See Hardin v. Kentucky Utilities Co., 390 U.S. 1, 6, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968). The first guideline of Cort v. Ash is met.

Second, while the legislative history is silent as to any indication to create a remedy, there is nothing to indicate disapproval of such actions.

Third, there is no inconsistency in allowing the cause of action under the legislative scheme. Unlike M. B. Guran Co., supra, it would appear that an action against the Board itself is clearly authorized by the APA. The review scheme is not upset by including as defendants those home loan banks who participated with the Board in the challenged activities.

Finally, such a cause of action is not one traditionally relegated to state law. Here we deal with the federally regulated activity of federal instrumentalities, not with unregulated private concerns. We, therefore, find that the plaintiffs have a right of action against the defendants for alleged

violations of the Home Loan Bank Act and possess the requisite standing to bring the action.

## LACHES

 Defendants urge that the district court erred in denying the cross motion for summary judgment on the ground of laches. Whether a party has been guilty of laches is an issue normally left to the discretion of the district court. Burnett v. New York Central Railroad, 380 U.S. 424, 435, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965); Czaplicki v. The Hoegh Silvercloud, 351 U.S. 525, 534, 76 S.Ct. 946, 100 L.Ed. 1387 (1956). Upon the record here we find that there was no abuse of discretion in the district court's resolution of the problem. While the defendants claim that there is a dispute of fact concerning the length of the delay between the authorization of this activity and the filing of the suit, a resolution of that conflict in favor of the defendants does not call for a different result. While no doubt the plaintiffs' private economic interests prompted their lawsuit, the issues raised are of general public interest. If the conduct of a governmental agency is unlawful, it does not in our judgment serve the public interest to condone its continuance merely because a private party did not complain of it sooner.

## THE MERITS

The heart of defendants' appeal is the contention that the district court applied an incorrect legal standard in interpreting the authority of the Home Loan Bank Board and of the banks under the Home Loan Bank Act, or alternatively, if a proper standard was followed, it was misapplied in the light of the facts here.

The Act confers no express power upon the Board or the banks to engage in the furnishing of data processing services. The defendants instead rely upon the delegation of incidental powers contained in §§ 11(a), 12(a), and 17(a) of the Act, 12 U.S.C. §§ 1431(a), 1432(a), 1437(a) (1970).[4] On

---

**4.** Section 11(a), 12 U.S.C. § 1431(a) (1970), states:

§ 1431. *Powers and duties of banks.*

(a) *Borrowing money; issuing bonds and debentures; general powers.*

Each Federal Home Loan *Bank* shall have power, subject to rules and regulations pre-

their part, the plaintiffs rely heavily on § 11(e) of the Act, 12 U.S.C. § 1431(e) (1970), which limits the scope of the home loan banks' powers:

> (e) Each Federal Home Loan Bank shall have power to accept deposits made by members of such bank or by any other Federal Home Loan Bank or other instrumentality of the United States, upon such terms and conditions as the board may prescribe, *but no Federal Home Loan Bank shall transact any banking or other business not authorized by this Act.*

(emphasis added). Therefore, the central issue is whether the supplying of data processing facilities is merely "incidental" to the express powers of the Board and banks or is an unauthorized venture into "other business."

In determining whether data processing services fall within the scope of the banks' incidental powers, the district judge relied primarily upon the standard articulated in *Arnold Tours, Inc. v. Camp,* 472 F.2d 427 (1st Cir. 1972). There the First Circuit held that the Comptroller of the Currency lacked authority under the National Bank Act, 12 U.S.C. § 24 *et seq.,* to issue regulations permitting the operation of full scale travel agencies by national banks. The Comptroller had relied on a provision allowing the banks to "exercise . . . all such incidental powers as shall be necessary to carry

---

scribed by the board, to borrow and give security therefor and to pay interest thereon, to issue debentures, bonds, or other obligations upon such terms and conditions as the board may approve, and *to do all things necessary for carrying out the provisions of this chapter and all things incident thereto.* (emphasis added).

Section 12(a), 12 U.S.C. § 1432(a) (1970), states:

> *§ 1432. Incorporation of banks; corporate powers; housing project loans.* (a) The directors of each Federal Home Loan Bank shall, in accordance with such rules and regulations as the board may prescribe, make and file with the board at the earliest practicable date after the establishment of such bank, an organization certificate which shall contain such information as the board may require. Upon the making and filing of such organization certificate with the board, such bank shall become, as of the date of the execution of its organization certificate, a body corporate, and as such and in its name as designated by the board it shall have the power to adopt, alter, and use a corporate seal; to make contracts; to purchase or lease and hold or dispose of such real estate as may be necessary or convenient for the transaction of its business, but, except with the prior approval of the board, no bank building shall be bought or erected to house any such bank, or leased by such bank under any lease for such purpose which has a term of more than ten years; to sue and be sued, to complain, and to defend, in any court of competent jurisdiction, State or Federal; to select, employ, and fix the compensation of such officers, employees, attorneys, and agents as shall be necessary for the transaction of its business, subject to the approval of the board; to define their duties, require

bonds of them and fix the penalties thereof, and to dismiss at pleasure such officers, employees, attorneys, and agents; and, by its board of directors, to prescribe, amend, and repeal bylaws, rules, and regulations governing the manner in which its affairs may be administered; and the powers granted to it by law may be exercised and enjoyed subject to the approval of the board. The president of a Federal Home Loan Bank may also be a member of the board of directors thereof, but no other officer, employee, attorney, or agent of such bank, who receives compensation, may be a member of the board of directors. *Each such bank shall have all such incidental powers, not inconsistent with the provisions of this chapter, as are customary and usual in corporations generally.* (emphasis added).

Section 17(a), 12 U.S.C. § 1437(a) (1970), states:

> *§ 1437. Federal Home Loan Bank Board; powers and duties; independent agency; report to Congress.*
>
> (a) The *board* shall supervise the Federal Home Loan Banks created by this chapter, shall perform the other duties specifically prescribed by this chapter, and *shall have power to adopt, amend, and require the observance of such rules, regulations, and orders as shall be necessary from time to time for carrying out the purposes of the provisions of this chapter.* The board shall have power to suspend or remove any director, officer, employee, or agent of any Federal Home Loan Bank, the cause of such suspension or removal to be communicated in writing forthwith to such director, officer, employee, or agent, and to such Federal Home Loan Bank.
>
> (emphasis added).

on the business of banking." The court explained:

> [A] national bank's activity is authorized as an incidental power "necessary to carry on the business of banking," within the meaning of 12 U.S.C. § 24, Seventh, if it is convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act. If this connection between an incidental activity and an express power does not exist, the activity is not authorized as an incidental power.

472 F.2d at 432.

From the foregoing language as well as a review of other comparable actions challenging the Comptroller's rule-making powers with respect to national banks,[5] the district judge concluded that, absent an express power to perform "services" for its member institutions and faced with the specific prohibitions of § 11(e), the providing of data processing services was beyond the lawful activity of the defendants.

While the standard set forth in *Arnold Tours* is helpful in resolving the issue here, it must be remembered that we are dealing not only with a different statute, but also with a somewhat different level of activity. These differences, taken with the express prohibition of § 11(e), convince us that if anything the activities of the home loan banks under their "incidental" statutory powers are even more restricted than the activities of national banks in *Arnold Tours*.

The competitive advantage enjoyed by the home loan banks on entering the data processing market is much greater than the national banks in the travel agency market, because the former are federal instrumentalities enjoying certain tax immunities. *Arnold Tours* would have been a more analogous case if it had involved an attempt to authorize the federal reserve banks to supply travel bureau services to its member banks. When the statutory scheme is viewed in this light, it becomes apparent that § 11(e) was aimed at preventing the kind of activity present here.

■ The involvement of the federal home loan banks in the activities of member institutions is limited to basically one important function. In *Laurens Federal Savings & Loan Associations v. South Carolina Tax Commission*, 365 U.S. 517, 521–22, 81 S.Ct. 719, 721, 5 L.Ed.2d 749 (1961), the Supreme Court described the general purpose of the Act:

> It set up a system of federally chartered Home Loan Banks for the purpose, as stated in the House and Senate Committee Reports, of placing "long-term funds in the hands of local institutions" in order to alleviate the pressing need of home owners for "low-cost, long-term, installment mortgage money" and to "decrease costs of mortgage money" with a "resulting benefit to home ownership in the form of lower costs and more liberal loans."

---

**5.** While there is a dearth of case law respecting the powers of the Board and the banks under the Federal Home Loan Bank Act, there have been numerous suits respecting the authority of the Comptroller of the Currency under 12 U.S.C. § 24 to expand the operations of national banks. Thus, as the district court noted,

> The Comptroller of the Currency has been barred from providing armored car services without regard to state branch banking laws, *First National Bank v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969); from operating collective investment funds, *Investment Company Institute, et al. v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); from operating a full-scale travel agency, *Arnold Tours, Inc. v. Camp*, 472 F.2d 427 (1st Cir. 1972); from

underwriting and dealing in obligations of states and political subdivisions not secured by general power of taxation, *Baker, Watts & Co. v. Saxon*, 261 F.Supp. 247 (D.C.1966), aff'd, 129 U.S.App.D.C. 173, 392 F.2d 497 (1968); from operating as insurance agents in a place having a population in excess of 5,000 inhabitants, *Georgia Association of Independent Insurance Agents, Inc. v. Saxon*, 268 F.Supp. 236 (N.D.Ga.1967), aff'd 399 F.2d 1010 (5th Cir. 1968); from engaging in closed end vehicle leasing transactions, *M & M Leasing Corporation v. Seattle First National Bank*, 391 F.Supp. 1290 (D.Wash.1975); and from making data processing services available to bank customers, *National Retailers Corporation of Arizona v. Valley National Bank*, 411 F.Supp. 308 (D.Ariz.1976).

To accomplish this purpose § 10 of the Act empowered the home loan banks to make "advances" to their member institutions on the security of home mortgages. 12 U.S.C. § 1430(a) (1970). The banks and the Board were also given the authority under § 8 to conduct studies on subjects useful to the home loan bank system. 12 U.S.C. § 1428 (1970). Finally § 5A gave the Board certain enforcement authority with respect to the requirement that member institutions of the banks maintain certain quantities of liquid assets. 12 U.S.C. § 1425a (1970). Measuring these limited although highly salutary means of assisting the home mortgage market against the much wider scope of activities carried on by the member associations, we are unable to find any justification in the express or incidental powers granted either to the Board or the banks for providing such extensive daily operational services to member institutions.

The defendants place much reliance upon *Greene County National Farm Credit Administration v. Federal Land Bank of Louisville*, 152 F.2d 215 (6th Cir. 1945), *cert. denied*, 328 U.S. 834, 66 S.Ct. 978, 90 L.Ed. 1610 (1946). In *Greene*, certain national farm loan associations challenged the authority of a federal land bank and its supervisory agency, the Farm Credit Administration, to carry out a reorganization of the system which would grant certain financial preferences to other member associations because of their financial difficulties. At the time of the suit, some member associations were insolvent and indebted to the Land Bank of Louisville in the amount of $1,480,000. A proposed reorganization plan for that district contemplated a reduction in the number of associations by consolidating smaller ones, which would more prudently allocate risks. The plan also called for a cancellation of the indebtedness and for the furnishing of funds to liquidate the claims of stockholders of the insolvent associations. There was no express power to carry out such a plan in the Federal Farm Loan Act, 12 U.S.C. §§ 636–1012. Nonetheless, we found that the allocation of funds was "an expedient for carrying out the broad pur-

poses of the statute" and was "within the field of discretion conferred upon them by the Congress." 152 F.2d at 220–21. We explained:

> The entire system is an integrated cooperative organization for the purpose of assuring farmers opportunity to borrow money upon long-term mortgages, at minimum interest rates, under the direction, supervision and with the aid of the government. That is the dominant purpose of the Act creating the associations and the bank, in the light of which the scope of the bank's authority must be determined.

> It would seem to be clear that the authority of the bank to effectuate the public purpose of the Act must be liberally viewed, and restrictions on power not lightly asserted without clear mandate of the statute therein expressed or clearly implied.

152 F.2d at 220.

We find no inconsistency between the decision in *Greene* with its reference to the "dominant purpose" of the legislation and the *Arnold Tours* standard. Certainly the dominant purpose of the governing statute is a relevant consideration, but in *Greene* the challenge conduct had a direct connection to the normal functions of the farm loan system. To approve here the supplying of on-line data processing capability simply on the basis that it is convenient and useful to the successful operation of the member thrift institutions is impermissible, especially in view of the limiting language of § 11(e).

The potential value of on-line data processing to home loan banks and to their member institutions is unquestioned. That is precisely what brought about this lawsuit. What is objectionable, however, under the present statute is the direct involvement of the home loan banks in the day-to-day internal operations of the member institutions, operations in which the institutions themselves traditionally have primary responsibility as separate legal entities. The proffered services represent an involvement not limited to matters of concern to

the home loan banks but extending to the entire range of operations of the member institutions.

We agree with the defendants that there may indeed be some benefit to a home loan bank in its own intelligence gathering capabilities from the employment of data processing services by member institutions. Any relation, however, between this advantage and the necessity that the service itself be furnished by the banks is not nearly so clear and is, we think, fully refuted by the undisputed facts here. For example, it is represented that the New York Home Loan Bank has abandoned all direct involvement in furnishing data processing service. We note further that the home loan banks do not require all member institutions to participate in the program in order to facilitate the banks' activities. We note also that in some instances the banks furnish services to institutions which are affiliated with a bank of another district, thus negating any possible benefit to the bank from that activity. A review of typical computerized services and reports offers further compelling evidence that any benefit to the banks is incidental. Many services, such as the preparation of receipts and of IRS 1099 forms for customers of member institutions, are matters of no importance to the banks. Neither are matters involving the processing of the member institutions' payrolls and other employee reporting data. The data processing services presumably extend to all of the financial activity at member institutions including the commercial borrowers and lenders whose activities may have little or no relationship to the home loan mortgage business. As mentioned earlier, at least one bank has even expressed an interest in being able to provide payroll services to customers of the member institutions. As stated, a wide variety of organizations may become member institutions under the Act, including insurance companies. There is little in the resolutions to indicate that such services might not as well be extended to savings banks or to life insurance companies for all of their varied accounting demands.

We do not suggest here that the home loan banks may not fully automate their operations by using computers or that the member institutions may not likewise do so. The Congress has specifically contemplated that certain types of member institutions may desire to provide such services for themselves. To that end § 905 of the Housing Act of 1964, Pub.L.No. 88–560, 78 Stat. 769, 805, added to § 5 of the Home Owners' Loan Act of 1933, 12 U.S.C. § 1464 (1970), a provision authorizing federal savings and loan associations to invest a percentage of their assets in corporations whose entire capital stock is available for purchase only by savings and loan associations chartered in the state of incorporation and federal savings and loan associations having their home offices therein. 12 U.S.C. § 1464(c) (1970). As the legislative history commented,

Savings and loan associations have many of the same needs for cooperative data processing as do commercial banks. This provision will permit Federal savings and loan associations to invest in service corporations established to render data processing services or other needed services to savings and loan associations. It would also permit Federal associations to invest in certain State corporations organized under State law whose purpose is to assist savings and loan associations in more fully meeting the mortgage needs of the area.

H.R. Rep. No. 1703, 88th Cong., 2d Sess., *reprinted in* [1964] U.S. Code Cong. & Ad. News 3416, 3443–44. Thus, so far as the needs of federal savings and loan associations are concerned, Congress has specifically provided authority for them to acquire such data processing services for themselves in a cooperative manner. We think it is significant that Congress thought it necessary to make an express provision for such an investment, but did not see fit to accord similar authority to the home loan banks.

In establishing the federal home loan bank system, it is apparent that the Congress had in mind a structure similar to the federal reserve system and the federal farm loan system, but designed to serve the small

saver and the small buyer by placing long-term funds in the hands of local thrift institutions. H.R. Rep. No. 1418, 72nd Cong., 1st Sess. 3, 8 (1932). While Congress might in its wisdom have established a totally integrated system whereby the federal home loan banks would be authorized to engage directly in the furnishing of general services, it saw fit instead to limit the banks' activities to serving as a reservoir of long-term funds for the home mortgage industry.

It should be stressed that nothing in this opinion is intended to restrict the Board or the banks from utilizing data processing services for the retrieval of or reporting of information which has a substantial connection to the express powers and responsibilities of the Board or the banks. The fact is, however, that the broad authorization of the Board and the services actually offered so far depart from any proper scope of the banks' activities as to warrant the relief granted by the district court. The great bulk of the specific services and reports assist the operations of the member institutions but have at best a tangential, insubstantial relationship to the express powers of the Board and the banks.

While no complaint has been made concerning the scope of relief or the form of the judgment entered by the district court, it is apparent to us that careful thought must be given by the district court to the problems of divestiture to assure a minimum disruption of essential services and minimum loss to the parties involved.

Our affirmance is, therefore, without restriction of the district court's right to make such modifications of the final judgment as may be necessary to achieve these objectives.

Affirmed.